## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **OXFORD FINANCE LLC, on its own behalf and as Agent for and Assignee of Webster Bank National Association,**<br>133 N. Fairfax Street<br>Alexandria, VA 22314-3299<br><br>*Plaintiff,*<br><br>v.<br><br>**ANDREW MCLELLAN,**<br>4159 White Horse Road,<br>Malvern, PA 19355-9650<br><br>**and**<br><br>**A. THOMAS MCLELLAN,**<br>729 Indian Beach Circle<br>Sarasota, FL 34234-5740<br><br>*Defendants.* | Case No: _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT—CIVIL ACTION

Plaintiff Oxford Finance LLC, on its own behalf and as Agent for and Assignee of Webster Bank National Association (collectively "Oxford"), files this Complaint—Civil Action against Andrew McLellan and A. Thomas McLellan, and avers as follows:

## SUMMARY OF THE CLAIMS

1. In January 2015, Andrew McLellan ("Andrew") invested $300,000 that he received from his father, A. Thomas McLellan ("Thomas"), in a new addiction rehabilitation company called Liberation Behavioral Health, LLC ("Liberation" or "LBH"). Through that investment, the McLellans became owners in LBH. In less than three years, the McLellans received $4.9 million when Liberation was purchased by a private equity firm, Fulcrum Equity Partners, LLC, for over $41 million. The Fulcrum purchase of Liberation was financed by Oxford Finance LLC, as lender and agent for Webster Bank National Association ("Oxford"),

which funded that acquisition with nearly $30 million ("Oxford-Fulcrum-Liberation Transaction").

2. Oxford funded the deal based on fraudulent information it received from Liberation related to Liberation's operations and finances. Liberation's financial reports and projections showed revenue growth in the millions based on reimbursements from insurers, including Independent Blue Cross ("IBC").

3. However, unbeknownst to Oxford, Liberation and its owners and employees were in the midst of regulatory and criminal investigations. In fact, after the deal closed and Oxford's funds were disbursed to LBH's former owners (including to the McLellans), state and federal indictments revealed that Liberation's operations were no more than a criminal enterprise that used the tragedy of opioid addiction as an occasion to commit insurance and healthcare fraud and used the company as a front for illegal kickbacks. In addition, Liberation's financials were fraudulently padded with accounts receivable income that would never materialize because it overstated its collection rate. and its largest payor had not yet closed an audit into Liberation's questionable billing practices.

4. Three months after the McLellans received nearly $5 million for their interest in Liberation, the Pennsylvania Attorney General began subpoenaing officers and employees of Liberation. A year later, Liberation, its affiliates, and over nine former owners, officers, and employees were indicted by the Pennsylvania Attorney General and the United States Attorney for the Eastern District of Pennsylvania for a myriad of criminal conduct. Less than 18 months after Oxford loaned $30 million, Liberation and its affiliated entities filed for bankruptcy.

5. As of this date, Liberation, its former CEO Jason Gerner, its former CFO Branden Coluccio, its former Medical Director Domenick Braccia, its affiliated physicians, and numerous

other individuals and entities are facing federal or state felony charges involving healthcare fraud, insurance fraud, money laundering, illegal kickbacks, medically unnecessary tests, and more. Gerner and Braccia have pled guilty to various charges, including fraud and conspiracy.

6.    As of the date of this Complaint, neither Andrew nor Thomas have been indicted. However, as a major investor and a Board Manager, both were privy to Liberation's business model and operations and were well-aware of the IBC audit and investigation—Thomas even assisted LBH when the audit first began. Moreover, as a Board Manager, Andrew McLellan also undoubtedly should have been aware of the various surveys and site visits by the Pennsylvania Department of Drug and Alcohol Programs ("DDAP") that found LBH in violation of a plethora of regulations. Thus, while not criminally indicted, the McLellans should have been aware of the improper and illegal operations at Liberation. Indeed, in September 2017, when discussing the need to obtain a lender, Andrew informed Gerner that he thought "shit [was] going to hit the fan." However, from the beginning, 'Andrew's focus at LBH was not to serve the interests of the company or its patients; he was solely focused with obtaining the highest bidder for his equity interest. In the end, the father and son flipped the $300,000 investment from Thomas into $5 million paid to Andrew—a return on investment of nearly 155%-160% per annum.

7.    Regardless of either McLellan's knowledge of the illegal operations, Andrew received $4.9 million from the sale of a criminal enterprise. The only reason Andrew received that money is because Oxford was fraudulently misled—through financials and disclosures it was provided and in conversations with Liberation's officers and attorneys—to believe that it was investing in a profitable, credible going concern. The criminal indictments, guilty pleas of officers and Board Managers, and bankruptcy of the company demonstrate that Liberation and its

management misled Oxford.  Under these circumstances, it would be unjust if the McLellans retained millions of dollars as a gratuitous benefit from the sale of a criminal, sham operation.

8.    Oxford, on its own behalf and as Agent for its co-lender, Webster Bank National Association, now brings this action against Andrew and Thomas McLellan for unjust enrichment, seeking a constructive trust and repayment to Oxford of the approximately $4.9 million that the McLellans received for their share in the sale of LBH.

## PARTIES

9.    Plaintiff Oxford Finance, LLC is a limited liability company with a single member: Oxford Holdco LLC. Oxford Holdco LLC is a limited liability company with only two members: WCP Oxford Ventures, LLC, and Oxford Finance Partners, LLC. WCP Oxford Ventures, LLC is a limited liability company all of whose members are individuals. Each individual member of WCP Oxford Ventures, LLC resides in and is a citizen of New York. Oxford Finance Partners, LLC is a limited liability company whose members are three individuals, one limited liability company, and one revocable living trust. Of the three individual members of Oxford Finance Partners, LLC, two reside in and are citizens of Virginia and one resides in and is a citizen of California. The limited liability company, which is a member of Oxford Finance Partners, has a single individual member that resides in and is a citizen of Virginia.  The revocable living trust, which is a member of Oxford Finance Partners, has two trustees, both of whom reside in and are citizens of Maryland.  Therefore, Oxford Finance, LLC—the plaintiff in this case—is a citizen of only the following states: New York, California, Virginia and Maryland.

10.    Oxford Finance LLC is organized as a limited liability company under the laws of Delaware with its principal place of business in Alexandria, Virginia.  Oxford's officers are

located at 133 N. Fairfax Street, Alexandria, VA 22314-3299. Oxford is a lender that provides financing to healthcare services companies.

11.    On information and belief, Defendant Andrew McLellan is an individual who resides at 4159 White Horse Road, Malvern, Chester County, Pennsylvania, 19355-9650. Andrew, therefore, is a citizen of Pennsylvania.

12.    Jointly with his father, Andrew was one of the first investors, and the member who invested the most initial capital, in Liberation. He also served as a Board Manager for Liberation from at least January 2015 through December 2017.

13.    On information and belief, Defendant Thomas McLellan is an individual who resides at 729 Indian Beach Circle, Sarasota, Sarasota County, Florida, 34234-5740. Thomas, therefore, is a citizen of Florida.

14.    Jointly with his son, he was one of the first investors, and the member who invested the most initial capital, in Liberation. He actively participated as an advisor, advocate, and consultant for Liberation through, at least, November 2016.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because damages exceed $75,000, and there is diversity of citizenship between Plaintiff and Defendants.

16.    Venue is proper under 28 U.S.C. § 1391 because Andrew McLellan resides in Chester County. In addition, the cause of action arose in part in Philadelphia County, and various transactions out of which the cause of action arose occurred in Philadelphia County.

17.    This Court has personal jurisdiction over the Defendants through their contacts as members (and, for Andrew, as a Board Manager) of Liberation Behavioral Health, LLC and their knowing participation in the business operations and management in Pennsylvania, which were

fraudulent and illegal, as set forth herein. This Court also has personal jurisdiction over Andrew because he resides within the Eastern District of Pennsylvania.

## FACTS

### I.    LIBERATION BUILT A LUCRATIVE BUT FRAUDULENT BUSINESS.

18.    At the center of this case is a network of drug treatment centers and associated facilities owned or controlled by Liberation Behavioral Health, LLC, a company with its principal place of business in Yardley and with treatment centers in Yardley, Bala Cynwyd, and Fort Washington.

19.    In 2014, Dallas Fetterman, Brendan Coluccio, and Jason Gerner founded an addiction rehabilitation company called Liberation Behavioral Health, LLC.

20.    Liberation's ostensible business was the treatment of drug and alcohol dependencies. But a Statewide Investigating Grand Jury later found that Liberation "generated millions of dollars in profits by exploiting individuals with drug and alcohol dependencies as tools to defraud insurance companies." Exhibit A at 1 (Grand Jury Presentment).[1] Paragraphs 20 and 21 of this Complaint summarize the findings of the Forty-First Statewide Investigative Grand Jury and are therefore alleged upon information and belief.

21.    The business model of Liberation depended upon illegal practices from the outset. Liberation illegally paid for patients' insurance policies, through purportedly independent entities, funded and controlled by Liberation. Liberation fraudulently invented "relocations" or new residences for patients to evade restrictions imposed by insurance companies on when an individual could obtain coverage. Almost a year before Oxford became involved, Liberation

---

[1] Exhibit A also contains the federal Criminal Informations against Jason Gerner, a founder of Liberation who served as COO and then CEO of the company, and Dr. Domenick Braccia, the "Medical Director" of Liberation. Both Gerner and Braccia have pled guilty to the charges.

admitted to IBC, one of its insurers, that it had procured 89 insurance policies via false "relocations" and wanted to repay the insurance proceeds received under these fraudulent premises. In addition, Liberation employed doctors, including Board Manager and "Medical Director" Braccia, who never saw patients and signed testing and treatment forms in blank so that services could be billed to insurers. Moreover, LBH officers and employees were involved in a kickback scheme whereby they received a portion of the proceeds from laboratories to which Liberation patients' blood and urine was sent for testing.

22.    Liberation's period of illegal conduct overlapped with the period that Andrew McLellan served as a Board Manager and investing member of the company.

## II.    ANDREW MCLELLAN INVESTED IN LBH WITH ASSISTANCE FROM HIS FATHER AND SERVED ON THE BOARD OF MANAGERS.

23.    In December 2014, Andrew McLellan was approached by Fetterman to invest in the new venture. McLellan received a presentation and an operating model, that outlined high insurer reimbursement amounts and multiple patient urine tests as revenue streams, for the company. By the end of January 2015, McLellan decided to invest in LBH.

24.    McLellan approached his father, Thomas, for the investment money. Thomas McLellan was the former Deputy Director of the Office of National Drug Control Policy, serving from 2009 to 2012 in the Obama Administration. In 2015, Thomas served as the founder and Chairman of the Board for Treatment Research Institute, a not-for-profit research and development institute in Philadelphia.

25.    Andrew requested and obtained around $300,000 from his father to invest in LBH. Thomas gave his son the money in lieu of Andrew's inheritance.

26.    As a result, Andrew (and his father) became the largest single holder of Class A (preferred) shares in LBH, owning 50% of those shares. Andrew also held 3% of the Class B

(founder) shares in LBH. Eventually, after a second round of investor funding, Andrew owned approximately 16% equity in Liberation. Andrew was the fourth largest equity owner after the three founding members.

27.     In addition, under Liberation's Operating Agreement, Andrew was granted the ability to appoint one of five Board Manager positions for LBH. Andrew appointed himself as a Board Manager.

## III.     THOMAS MCLELLAN MARKETED AND PROVIDED LEGITIMACY TO HIS SON'S COMPANY.

28.     In the beginning, Thomas McLellan was instrumental in establishing the reputability of his son's company, LBH. For example, in April 2015, LBH was attempting to meet with Carrier Clinics, a New Jersey behavioral health system and potential partner. In emails, Fetterman stated that Liberation was a sober housing group of which "Thomas McLellan's son is the primary owner, and Thomas is also a supporter and advocate of." It appears that in May 2015, Thomas met with John O'Neill and Don Parker of Carrier. In follow-up emails dated May 25 and May 26, 2015, Thomas wrote to Carrier Clinic in order to suggest partnerships between Carrier, Liberation, and/or Thomas' research company, Treatment Research Institute.

29.     Later that year, in November 2015, Thomas provided an endorsement of the Coalition of Treatment Providers, an industry organization that attempted to distinguish its members as "good operators" versus others in the industry. LBH was a member of the Coalition through Gerner and Fetterman. In his endorsement, Thomas wrote that the Coalition was creating ethical standards to assist with the "addiction treatment field to reduce the prevalence of fraudulent billing, patient brokering, excessive urine testing without meaningful clinical

consideration and cash kickbacks." This statement would prove to be a harbinger of LBH's own fraudulent practices.

## IV.    THROUGHOUT HIS TENURE, ANDREW MCLELLAN LEVERAGED HIS INSIDER STATUS TO MAXIMIZE HIS OWN FINANCIAL BENEFIT TO THE DETRIMENT OF THE COMPANY.

30.    Sometime prior to May 2016, the Board of Managers, including Andrew McLellan, received updates from the LBH officers on the financial status of the company.

31.    Sometime around May 2016, after receiving the 2016 Q1 updates, Andrew revealed financial data and LBH's plans for future growth to Recovery Associates of America, a local competitor. On information and belief, Andrew did so in order to obtain a purchase offer from Recovery Associates of America for Andrew's equity shares.

32.    Due to this breach of confidentiality and fiduciary duty, in May 2016, Fetterman, Coluccio, and Gerner offered Andrew three times his original investment (i.e., $900,000) in order to buy back Andrew's shares of the company. On May 17, 2016, Andrew rejected the offer and asked for an independent valuation of the company. That counter was rejected by the founders, and on May 25, 2016, Gerner asked Andrew what Andrew desired. Andrew responded that he desired to move forward with the original plan of selling the company in 2 to 3 years.

## V.    IN THE LATTER HALF OF 2016, THE MCLELLANS PUSHED FOR ACCESS TO COMPANY RECORDS IN ORDER TO "SHOP AROUND" THEIR EQUITY OWNERSHIP.

33.    In September 2016, an attorney for both Thomas and Andrew wrote to Coluccio and requested to see the financial information, financial statements of the company and any financing term sheet regarding a loan the company obtained. LBH's attorneys were informed that the McLellans' purpose in requesting the documents was in order to shop around the company and either obtain a valuation of the entire company or to obtain a "stalking horse" counter offer to the buyout offer that was extended to Andrew in May 2016.

## VI.    WHILE ANDREW WAS "SHOPPING AROUND" LBH TO BE PURCHASED, INDEPENDENCE BLUE CROSS BEGAN AN AUDIT OF LBH'S CLAIMS.

34.    In the words of the Grand Jury Presentment, Liberation "targeted" IBC, which became its most significant insurer by number of patients and by dollar volume of claims. IBC opened an investigation of Liberation in September 2016. On October 27, 2016, Liberation received a letter from IBC in which it indicated it would be performing a 100% prepayment review of all claims submitted by Liberation. IBC had "significant concerns about the eligibility and circumstances around the enrollment of many of the members receiving services" at Liberation's facility. IBC issued an audit notice, in part, because it wanted to investigate LBH's use of "relocation policies." IBC requested a meeting at its offices during the week of November 7, 2016 to discuss these concerns. A meeting was eventually scheduled for November 21, 2016.

## VII.    IN ORDER TO PRESERVE THE INTEGRITY OF LBH AND HIS SON'S EQUITY INTEREST IN THE COMPANY, THOMAS MCLELLAN ASSISTED LBH WHEN IBC BEGAN TO INVESTIGATE THE COMPANY.

35.    Soon after receiving the audit notice from IBC, on November 1, 2016, Fetterman, Coluccio, and Gerner corresponded with LBH's regulatory counsel and discussed involving Thomas in discussions with the IBC investigator. Gerner spoke with Thomas and passed along to LBH's attorneys, Coluccio, and Fetterman that Thomas stated that he would reach out "to his higher up contacts" with whom he worked and helped to write policies. Per Gerner, Thomas also informed Gerner that he "believe[d] that the relocation policies that should be paid back are the ones that the client did not remain in the area." On information and belief, Gerner informed Thomas that LBH had improperly purchased insurance policies for patients using the relocation exception to enrollment.

36.    Ultimately, Thomas joined LBH officers and attorneys at the meeting with the IBC investigator on November 21, 2016. In fact, in the PowerPoint presentation to IBC, the very

first slide is a highlight of Thomas McLellan's resume. LBH paid Thomas $3,000 in consulting fees to attend the meeting with the investigator and also paid for his hotel and airfare.

37.    At the meeting, on information and belief, Thomas heard Gerner, a Liberation executive officer and Board Manager, who recently pled guilty to federal felonies involving healthcare insurance fraud, acknowledge to IBC that some 89 "relocation policies" should not have been acquired. At that meeting, on information and belief, Thomas heard Gerner offer to "right their wrongs" and reimburse IBC for the claims paid under these policies. Liberation never made any such reimbursement, and LBH never revealed Gerner's statements nor his offer to Oxford. On the contrary, Liberation misrepresented the audit as a routine, "get to know you" audit rather than an investigation of illegally obtained relocation policies.

## VIII.    ON OR ABOUT DECEMBER 2016 AND JANUARY 2017, LBH RECEIVED AN OFFER FROM A PRIVATE EQUITY FIRM TO PURCHASE THE COMPANY.

38.    Interest in LBH by various purchasers was high in December 2016 and included the eventual purchaser, Fulcrum Equity Partners (which acquired its equity stake in Liberation using funds borrowed from Oxford in the Oxford-Fulcrum-Liberation Transaction).

39.    Andrew repeatedly sought updates from Gerner on the progress of the purchase deal once Fulcrum provided the company its letter of intent.

## IX.    IN MAY 2017, ANDREW MCLELLAN SOUGHT PAYMENT FROM LBH AND THREATENED SUIT IF HIS DEMANDS WERE NOT MET.

40.    On May 17, 2017, Andrew, through his attorney, informed LBH that he intended to file a lawsuit against the company and Fetterman, Gerner, and Coluccio due to bonus payments, salaries, and the alleged dilution of his membership interest. In exchange for not filing a lawsuit, Andrew demanded $1.5 million and an additional 3% membership interest.

41.    On information and belief, McLellan only dropped his threat once he himself was targeted with countersuit because his lawsuit would jeopardize the sale of the company to Fulcrum. Thus, Andrew held out for a larger pay day.

## X.    IN SEPTEMBER 2017, THE LBH BOARD VOTED TO REMOVE ANDREW MCLELLAN AS A BOARD MANAGER AND ANDREW THREATENED FURTHER LAWSUITS.

42.    On July 21, 2017, LBH held a board meeting, initially requested by Andrew, to get an update on the Fulcrum deal.  Post-meeting, in August 2017, Andrew wrote to LBH's attorney and outlined his understanding of what transpired at the meeting.  Among other things, Andrew asked about profit distributions, stating that he understood distributions would be paused until after the Fulcrum deal closed.  In back-and-forth with the attorney, McLellan referred to "a voice recording of the July 21 meeting" he had where it was stated that profits would be dispersed post-closing.

43.    Based on Andrew's illegal recording of a Board meeting, on September 7, 2017, the Board voted to suspend Andrew from the Board indefinitely.  Andrew was informed of this decision on September 12, 2017 via a suspension letter. Upon receipt, Andrew wrote to LBH's counsel:  "please be properly informed here now that there are no recordings of the July 21 meeting nor were there ever any such recordings."  Andrew stated that the recordings were his own thoughts post-meeting.  He assumed his automatic reinstatement.

44.    When he was not reinstated officially, Andrew again threatened legal action unless he received a formal retraction of the suspension from the Board.

## XI.    ANDREW MCLELLAN RESIGNED FROM THE BOARD IN EXCHANGE FOR AN OFFER OF PAYMENT OF $650,000.

45.    However, on information and belief, sometime between September 2017 and December 2, 2017, Andrew and Gerner spoke, and Gerner offered Andrew $650,000 if Andrew

- 12 -

dropped his threatened lawsuit and conditionally resigned from the Board. The resignation was conditional because it was void if the sale to Fulcrum faltered.

46.    In or about September 2017, Andrew wrote to Gerner and stated that he would not do anything to harm the sale of the company. Andrew also wrote to Gerner and stated that he knew "shit [was] going to hit the fan." By that time, Andrew repeatedly sought updates on the closing of the Fulcrum deal and pushed for distribution of the company profits.

47.    On December 2, 2017, Andrew conditionally resigned from the Board.

## XII.    RELYING ON FRAUDULENT INFORMATION, OXFORD DISBURSED $29.6 MILLION AT CLOSING.

48.    Oxford and Webster loaned the vast majority of the funds to Fulcrum to finance Fulcrum's purchase of LBH, disbursing $29.6 million. On or about September 22, 2017, Oxford and Fulcrum agreed upon a term sheet for the loan. According to that term sheet, Oxford would lend funds to a subsidiary of Fulcrum, which would use the funds plus some of its own funds to purchase 70% of Liberation.

49.    This transaction closed on December 11, 2017, when Oxford and Webster loaned $29.6 million, and Fulcrum added about $12 million of its own money to purchase 70% of Liberation.

50.    One of the key provisions of the Oxford-Fulcrum-Liberation Transaction documents was Article II of the Unit Purchase and Contribution Agreement ("Unit Purchase Agreement"), which contained the representations and warranties from the seller—Liberation—about the soundness of the seller's business. Liberation represented, among other things, that it had all the licenses necessary to carry on its business as it was then conducted, that it was (and had always been) in compliance with all applicable laws, that it never paid or received any kickbacks, and that all of its claims and billings had always been in compliance not just with the

law but with insurance company guidelines—except as expressly disclosed in the "Disclosure Schedule" provided by Liberation. Those representations were false and/or misleading.

51. When deciding to loan money for the transaction, Oxford and Webster also relied on the financial statements provided by LBH. Those statements revealed that LBH was profitable with expected revenue in the millions, including $14 million in net receivables pending from insurers. However, the accounts receivables were overstated by approximately $5 million.

52. Moreover, Liberation and its agents represented to Oxford that the audit from IBC was no more than a routine effort by the insurer to familiarize itself with a "new player" in the addiction treatment arena. No one from LBH mentioned the illegal relocation policies that were used or investigated by IBC. Based on the information it was provided, Oxford mistakenly assumed it was funding a legitimate operation.

53. For his share of equity in the company, Andrew received $4.9 million from the sale of the company to Fulcrum.

## XIII. REGULATORY SCRUTINY FROM THE PENNSYLVANIA DEPARTMENT OF DRUG AND ALCOHOL PROGRAMS.

54. The Pennsylvania Department of Drug and Alcohol Programs regulated Liberation and periodically conducted site visits at Liberation facilities. Liberation had performed poorly during those site visits, with violation after violation found by DDAP. DDAP found violations at Liberation facilities during virtually all, if not all, of its site visits. For example, the DDAP site inspection of Liberation's Yardley facility on February 9, 2016 produced an eight-page report with six different violations. DDAP's report on its inspection of the Fort Washington facility on March 31, 2017 filled six pages and noted non-compliance with six different provisions of Pennsylvania's licensing standards.

55.     Unknown to Oxford, LBH continued to fail DDAP surveys that DDAP conducted in the weeks preceding the closing of the Oxford-Fulcrum-Liberation Transaction. Then, two days after the closing, DDAP conducted another on-site survey of Liberation's Fort Washington facility and found it to be non-compliant in eighteen different ways. This survey was prompted by the earlier (November 2, 2017 and November 16, 2017) investigations at Yardley and Fort Washington, about which the Disclosure Schedule had rather laconically "disclosed" that there was "no written report" (yet). On March 22, 2018, DDAP sent Gerner, Coluccio, and Liberation a terse but direct two-page letter that recited the long list of violations found and also made clear that DDAP had indeed given specific instructions to Gerner in person during the November 2017 visits, calling Gerner's attention to certain violations and "direct[ing]" Liberation to take certain corrective measures.    The March 22, 2018 letter then "direct[ed] Liberation . . . to halt admissions at their licensed drug and alcohol programs upon receipt of this letter," and to "decrease the patient census at both the Yardley and Fort Washington locations."    Within sixty days, Liberation was required to make cuts of 75% or more in each of its patient populations across the various facilities. Liberation's business deteriorated steadily from there.

56.     Around the same time, LBH and its employees were subpoenaed by the Pennsylvania Attorney General to provide testimony to a grand jury.

57.     No one informed Oxford of the full extent of the DDAP sanctions or the Pennsylvania Attorney General's investigation.

## XIV.  INDICTMENTS MATERIALIZED AND LBH FILED FOR BANKRUPTCY.

58.     The Pennsylvania Attorney General's investigation did not go away. It continued through the remainder of 2018 and into 2019. In October 2018, Liberation learned that the United States Attorney's Office had opened an investigation into Liberation's conduct. Oxford learned about this new investigation only in January 2019.

59.    On March 25, 2019, the Pennsylvania Attorney General, Josh Shapiro, and Assistant United States Attorney Jennifer Williams published a press release entitled, "Owners and Operators of Liberation Profited Millions by Running Illegitimate 'Sober Living Homes' and Defrauding Insurance Companies." They announced, "state and federal criminal charges against eleven people and nine businesses" that were "the result of an 18-month investigation."

60.    On April 17, 2019, Liberation filed for voluntary liquidation under Chapter 7 of the Bankruptcy Code.

61.    Oxford's losses to date include $29.6 million, excluding interest.

## COUNT I

### (Unjust Enrichment – Andrew McLellan and Thomas McLellan)

62.    Plaintiff Oxford incorporates all prior paragraphs herein by reference as if each of the allegations were fully set forth herein.

63.    At all times relevant to this action, Andrew McLellan was a Board Manager of LBH. Andrew and Thomas McLellan were also investing members in LBH.

64.    On information and belief, both McLellans either knew, should have known, or had a duty to know that LBH was running illegal operations and committing insurance and healthcare fraud.

65.    LBH misrepresented and defrauded Oxford in order to close the deal with Fulcrum and induce Oxford to loan approximately $29.6 million by withholding information and misrepresenting information related to LBH's finances, the DDAP surveys, the IBC audit, and the Pennsylvania Attorney General's criminal investigation.

66.    As a result, Andrew McLellan personally, and Thomas McLellan, on behalf of his son, wrongfully secured or passively received and benefited from approximately $4.9 million of Oxford's funds.

67.    Andrew McLellan personally, and Thomas McLellan, on behalf of his son, have, consequently, been unjustly enriched.

68.    To allow the McLellans to retain those funds, without compensating Oxford, would be unconscionable and inequitable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Oxford requests:

(a)    that judgment be entered in favor of Plaintiff Oxford for an amount of $4.9 million;

(b)    that the Court order the McLellans to hold $4.9 million in a constructive trust in favor of Plaintiff Oxford;

(c)    that Plaintiff Oxford recover pre-judgment interest and be awarded post-judgment interest to the fullest extent available under applicable law; and

(d)    that the Court award such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff Oxford demands a trial by jury as to all issues so triable.

Respectfully submitted this 17th day of October, 2019.

**BOCHETTO & LENTZ, P.C.**

By: _____

Gavin P. Lentz, Esquire
Supreme Court I.D. No. 53609
Albert M. Belmont, III, Esquire
Supreme Court I.D. No. 84817
1524 Locust Street
Philadelphia, PA 19102-4401
(215) 735-3900
*Counsel for Plaintiff Oxford Finance LLC*

*OF COUNSEL*

GOLDBERG KOHN LTD.
David J. Chizewer
Harleen Kaur
(admission *pro hac vice* motion to be filed)
55 East Monroe Street, Suite 3300
Chicago, IL 60603
(312) 201-4000